IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| CALVIN PERRY, ) | |
|     Plaintiff, ) | Civil Action No. 7:16-cv-00362 |
| ) | |
| v. ) | |
| ) | By: Elizabeth K. Dillon |
| JPAY, INC., *et al.*, ) |     United States District Judge |
|     Defendants. ) | |

**MEMORANDUM OPINION**

Calvin Perry, a Virginia inmate proceeding *pro se*, filed a civil rights action pursuant to 42 U.S.C. § 1983, alleging, *inter alia*, that defendants Warden Booker and Unit Manager (UM) Lovern subjected him to cruel and unusual living conditions through inadequate cell lighting and that defendants UM Collins and Lt. Ridge retaliated against him for filing grievances.[1] The parties have filed cross-motions for summary judgment, and this matter ripe for disposition.[2] Having considered the record, the court concludes that Perry's motion for partial summary judgment must be denied and the defendants' motion for summary judgment must be granted.

I. BACKGROUND

In his verified complaint, Perry asserts that he was "daily subjected" to inadequate lighting in his cell while he was housed at Green Rock Correctional Center (Green Rock),[3] causing him to strain his eyes while "trying to see in the dark cell to read or to do [his]

---

[1] By memorandum opinion and order entered March 13, 2018, the court dismissed all of the other claims Perry raised in this action. *See* Dkt. Nos. 39 and 40.

[2] In response to defendants' motion for summary judgment, Perry argues that defendants Warden Booker and UM Lovern violated this court's order by not filing their own affidavits. *See* Pl.'s Resp. Opp'n. ¶ 1, Dkt. No. 47. By order entered March 13, 2018, the court directed the remaining defendants to file a motion for summary judgment, "supported by affidavit(s)." *See* Dkt. No. 40. The court did not direct the defendants to file their own affidavits, however. Accordingly, the court rejects Perry's assertion that the defendants failed to comply with the court's order.

[3] The court notes that Perry has now been transferred to Coffeewood Correctional Center. *See* Dkt. No. 41.

homework or to retrieve items from [his] locker." Perry states that UM Lovern and Warden Booker instructed "all staff" to immediately turn off the bright lights after each count was completed. Perry asserts that the lights were "off" for over twenty-three hours every day. As a result, Perry developed chronic migraines, constant eye pain, and continuous fatigue. On May 2, 2016, Perry went to the prison medical department seeking treatment for his eye pain and fatigue caused by having to strain to see in his "'extremely' dim cell." The nurse offered to refer him to an eye doctor. (Compl. ¶¶ 29-31, 52, 54, Dkt. No. 1; Grievance Resp., Dkt. No. 1-2, 29.)

As he was leaving the medical department on May 2, 2016, Perry encountered Warden Booker and complained to him about the inadequate cell lights. In response, Warden Booker told him that, "the inmates here like being in the dark, they took a vote for the bright cell lights to be turn[ed] off, I suggest you buy yourself a lamp from the canteen." On or about May 3, 2016, Perry asked UM Lovern why he "authorize[d prison] staff to turn off the bright cell lights immediately after each count is completed." Lovern did not answer, but he instructed Perry to return to his assigned area. (Compl. ¶¶ 30-31, Dkt. No. 1.)

On May 16, 2016, Perry filed a grievance complaining that he suffered "ongoing" eye pain and fatigue from straining to see in his "extreme[ly] dim cell." Warden Booker responded to the grievance by indicating that Perry had been seen in the medical department and referred to an eye doctor for his eye pain. (Reg. Grievance, Dkt. No. 1-2, 36; Grievance Resp., Dkt. No. 1-2, 30.)

In support of his verified complaint, Perry submits a declaration of inmate Downey who states that he too is housed at Green Rock and that the "only time that the bright lights are turn[ed] on is at count and then [they are] immediately turn[ed] off when count is over."

Downey avers that he has problems seeing to read and take care of his basic needs. (Downey Decl., Dkt. No. 1-2, 12.)

Perry also asserts that defendants UM Collins and Lt. Ridge retaliated against him after he filed an informal complaint on May 13, 2016, concerning the dogs of the BARK Behind Bars Correctional Companion Program[4] using the recreation yard to "relieve themselves of body waste." On May 16, 2016, Perry was "summoned" to UM Collins and Lt. Ridge's office where UM Collins stated, "since you're complaining about the dogs, I'm going to get Lt. Ridge to move you across the yard to another b[uildin]g." (Compl. ¶ 41, Dkt. No. 1; Informal Compl., Dkt. No. 1-2, 15.)

On June 23, 2016, Lt. Ridge went to Perry's cell in the "A" building and stated, "Mr. Perry, since you like writing complaints on the dogs, pack your stuff up. I am moving you across the yard to 'C' [Building], cell #220, bottom bunk."[5] Perry responded, "I have not requested to be moved and I do not want to be moved to 'C' nor 'D' [Building]. I'm okay right here on 'A' side." Lt. Ridge responded back, "You are being moved to 'C' [Building] this morning and if you refuse to move, I will place you in jail," referring to the segregation unit. (Compl. ¶¶ 41-42, Dkt. No. 1.)

Defendants filed a motion for summary judgment, supported by affidavits, arguing that Warden Booker and UM Lovern did not subject Perry to inadequate lighting and were not

---

[4] The BARK Behind Bars Correctional Companion Program is offered at Green Rock and brings together inmates and hard to adopt dogs for their mutual benefit. Under the supervision of correctional staff members, inmates receive therapeutic rehabilitation by training and socializing the dogs in their care and maintaining diaries on the dogs' progress. Green Rock hosts eight dogs that are assigned to live with their assigned inmate handler for six weeks. Six of the dogs live in "B" Building and two of the dogs live in "C" Building. All of the dogs utilize the "A/B" yard for the recreation and bathroom time. Each dog remains on a leash in the recreation yard, and the inmate handler is required to pick up the dog stool and dispose of it. (Collins Aff. ¶¶ 4-5, Dkt. No. 45-1.)

[5] The court notes that Perry's prior *top* bunk assignment in "A" Building was the subject of one of Perry's claims raised and previously dismissed in this action. *See* Mem. Op., 1-2, 18, Dkt. No. 39. Perry argued that the top bunk assignment was very unsafe. *Id.*

3

deliberately indifferent to unsafe prison conditions.  They also argue that UM Collins and Lt. Ridge did not retaliate against Perry and that Perry has not demonstrated any adverse action taken against him or causation.  Finally, defendants argue that they are entitled to qualified immunity.  (Mem. Supp. Mot. Summ. J., Dkt. No. 45.)

In support of their arguments concerning the cell lighting, defendants provide the affidavit of Corrections Major Northup, Chief of Security at Green Rock, which states that inmates housed in the A-3 pod, where Perry was housed at the time of his complaints, have three sources of lights in their cells, including the cell window, the ceiling light, and the pod lights. The pod and cell lights stay on at all times, the pod is never completely dark, and all lights are controlled by staff.  Throughout the day, there are five offender counts conducted, with the final count done at 11:30 pm.  After this final count, the lights are dimmed to "sleep mode" for the night.  In sleep mode, the lights provide less illumination of the pod but are still on.  The lights return to "normal operation" at 6:30 am to provide staff a clear view into the cells for morning count.  After this count is complete, the lights may be dimmed back down until 7:30 am or 8:00 am as a courtesy to kitchen workers who work most of the night and return to their cells in the early morning hours. At approximately 7:30 am or 8:00 am, the pod lights are turned back on when the "normal work day" begins.  The lights stay at "normal levels" during daylight hours. Major Northup also avers that inmates may purchase lamps for their cells from the canteen. (Northup Aff. ¶ 4-5, Dkt. No. 45-2.)

In support of the arguments concerning the retaliation claim, defendants provide affidavits of UM Collins and Lt. Ridge.  UM Collins avers that on May 13, 2016, he received an informal complaint from Perry concerning him having to use the same exercise yard as the dogs and claiming that the yard was "pungent with feces and urine."  In response to Perry's complaint,

UM Collins checked the yard and did not detect any "strange aroma." UM Collins also states that he had not received any other complaints from staff or inmates about odors. On May 19, 2016, UM Collins informed Perry that the inmate dog handlers remove feces and spray the affected areas with appropriate chemicals. UM Collins advised Perry that, in the past, when an inmate assigned to "A" or "B" Buildings had issues with the dogs, a cell change was offered to the "C" or "D" Buildings because the dogs do not use the "C/D" yard. Perry was transferred to the "C" Building on June 23, 2016. The housing units in "A" Building and "C" Building are both general population and have the same privileges. Lt. Ridge states that purpose of Perry's move was to provide him with a dog-free environment. Both UM Collins and Lt. Ridge aver that they did not retaliate against Perry. (Collins Aff. ¶¶ 7-8, Dkt. No. 45-1; Ridge Aff. ¶ 4, Dkt. No. 45-3.)

In response to defendants' motion for summary judgment, Perry filed his own declaration as well as those of inmates Downey and Parrotte. All of the declarations state that the "bright cell lights" were "always" turned off by the security staff, except during counts. Inmate Parrotte also states that the cells are "very dim" and that "due to the small size of the cell windows, virtually no light was admitted into the cells." Perry also provides a response to an informal complaint which indicates that lights are "dimmed" at 8:15 am, turned up at 3:15 pm, and then "re-dimmed" at approximately 6:15 pm. (Perry Decl. ¶ 1, Dkt. No. 47-1; Downey Decl., Dkt. No. 47-4; Parrotte Decl. ¶¶1-2, Dkt. No. 47-5; Resp. Informal Compl. Dkt. No. 47-1, 4.)

With regard to the retaliation claim, Perry avers that he did not "want" to be moved to "C" or "D" Building, the dogs go to the bathroom in both "A/B" and "C/D" recreation yards, and sometimes it is cleaned up and sometimes it is not. (Perry Decl. ¶¶ 5-6, Dkt. No. 47-2.)

## II. DISCUSSION

### A. Summary Judgment Standard

Federal Rule of Civil Procedure 56(a) provides that a court should grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "Material facts" are those facts necessary to establish the elements of a party's cause of action. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine dispute of material fact exists if, in viewing the admissible evidence and all reasonable inferences drawn therefrom in a light most favorable to the non-moving party, a reasonable fact-finder could return a verdict for the non-movant. *Id.* The moving party has the burden of showing – "that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the movant satisfies this burden, then the non-movant must set forth specific facts that demonstrate the existence of a genuine dispute of fact for trial. *Id.* at 322-24.

A court may not resolve disputed facts, weigh the evidence, or make determinations of credibility. *Russell v. Microdyne Corp.*, 65 F.3d 1229, 1239 (4th Cir. 1995); *Sosebee v. Murphy*, 797 F.2d 179, 182 (4th Cir. 1986). Instead, a court accepts as true the evidence of the non-moving party and resolves all internal conflicts and inferences in the non-moving party's favor. *Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th Cir. 1979). However, "[m]ere unsupported speculation . . . is not enough to defeat a summary judgment motion." *Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc.*, 53 F.3d 55, 62 (4th Cir. 1995). The evidence relied on must meet "the substantive evidentiary standard of proof that would apply at a trial on the merits." *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1315-16 (4th Cir. 1993) ("The summary judgment inquiry thus scrutinizes the plaintiff's case to determine whether the plaintiff has

proffered sufficient proof, in the form of admissible evidence, that could carry the burden of proof of his claim at trial."); *Sakaria v. Trans World Airlines*, 8 F.3d 164, 171 (4th Cir. 1993) (finding that the district court properly did not consider inadmissible hearsay in an affidavit filed with motion for summary judgment).

Additionally, a party may not amend a complaint through argument in a brief opposing summary judgment. *Cloaninger v. McDevitt*, 555 F.3d 324, 336 (4th Cir. 2009). In the Fourth Circuit, verified complaints by *pro se* prisoners are to be considered as affidavits and may, standing alone, defeat a motion for summary judgment when the allegations contained therein are based on personal knowledge. *Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir. 1991).

## B. Living Conditions

To establish that living conditions constitute cruel and unusual punishment, a prisoner must prove (1) that "the deprivation of the basic human need was objectively sufficiently serious," and (2) that "subjectively the officials acted with a sufficiently culpable state of mind." *Strickler v. Waters*, 989 F.2d 1375, 1379 (4th Cir. 1993) (internal quotation marks omitted). Only extreme deprivations are adequate to satisfy the objective component of an Eighth Amendment claim regarding conditions of confinement. *See, e.g., Hudson v. McMillian*, 503 U.S. 1, 8-9 (1992). In order to demonstrate such an extreme deprivation, a prisoner must allege "a serious or significant physical or emotional injury resulting from the challenged conditions," *Strickler*, 989 F.2d at 1381, or demonstrate a substantial risk of such serious harm resulting from the prisoner's exposure to the challenged conditions, *Helling v. McKinney*, 509 U.S. 25, 33–35 (1993).[6] The subjective component of an Eighth Amendment claim challenging the conditions of confinement is satisfied by a showing of deliberate indifference by prison officials. *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994). "Deliberate indifference entails something more

---

[6] Perry provides no medical evidence of harm or risk thereof.

7

than mere negligence . . . [but] is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Id.* at 835. It requires that a prison official actually know of and disregard an objectively serious condition, medical need, or risk of harm. *See id.* at 837; *Shakka v. Smith*, 71 F.3d 162, 166 (4th Cir. 1995).

There is no evidence before the court that demonstrates that UM Lovern was deliberately indifferent regarding the cell lighting. Perry states that he approached UM Lovern and asked why he had authorized staff to turn off the bright cell lights, but he does not provide any evidence that he told UM Lovern or that UM Lovern knew that Perry was suffering migraines, eye pain, and fatigue because of the dim lights. There are no facts from which UM Lovern could have drawn the critical inference that the lighting level was causing Perry harm. Accordingly, the court will grant summary judgment for UM Lovern and deny it for Perry as to this claim.

Perry, however, does provide evidence that Warden Booker knew of the eye pain and fatigue caused by the dim lights in his cell. Warden Booker responded to Perry's grievance concerning the pain and fatigue he was suffering from straining to see in his cell. But, Perry has not demonstrated that Warden Booker deprived him of an objectively sufficiently serious basic human need. It is true that the parties dispute the light schedule in the cells. Perry submits evidence that his cell lights are turned "off" or "very dim" at all times other than during counts. Defendants submit evidence that the lights are at a "normal" level briefly at 6:30 am, then against at 7:30 or 8:00 am, and continue at this brightness 'during daylight hours." Further, Perry submits a response to an informal complaint in which UM Wingfield states that after a vote by inmates, it was decided that lights are "dimmed" at 8:15 am and "cut back on" at 3:15 pm and then "re-dimmed" at 6:15 pm. However, it is undisputed that if Perry needs more lighting in his cell, he may buy a lamp from the canteen to use in his cell. Perry even acknowledges that

8

Warden Booker told him this. Accordingly, the court will grant summary judgment for Warden Booker and deny it for Perry as to this claim.

## C. Retaliation

A First Amendment retaliation claim under § 1983 consists of three elements: (1) the plaintiff engaged in constitutionally protected First Amendment activity; (2) the defendant took an action that adversely affected that protected activity; and (3) there was a causal relationship between the plaintiff's protected activity and the defendant's conduct. *Martin v. Duffy*, 858 F.3d 239, 249 (4th Cir. 2017).

Prisoners have a "First Amendment right to be free from retaliation for filing a grievance" under the prison's established grievance procedure. *Booker v. S.C. Dep't of Corr.*, 855 F.3d 533, 541 (4th Cir. 2017). "[F]or purposes of a First Amendment retaliation claim under § 1983, a plaintiff suffers adverse action if the defendant's allegedly retaliatory conduct would likely deter a person of ordinary firmness from the exercise of First Amendment rights." *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 500 (4th Cir. 2005). A plaintiff's "actual response to the retaliatory conduct" is not dispositive of the question of whether such action would likely deter a person of ordinary firmness. *Id.*

The parties do not dispute that Perry filed an informal complaint concerning the dogs defecating in the recreation yard while he was housed in "A" Building. The parties also do not dispute that, as a result of Perry's complaint, he was transferred to "C" Building. Perry argues that the transfer was retaliatory because he did not "want" to be transferred to the other building. Defendants submit uncontroverted evidence that both of Perry's housing assignments in the "A" Building and "C" Building were general population assignments and had the same privileges.[7]

---

[7] Perry complains in a grievance that his transfer to "C" Building would "prevent" him from ever being assigned to the Honor Pod. However, UM Collins avers that regardless of his move to "C" Building, Perry would

9

Lt. Ridge avers that the purpose of Perry's move was to provide him with a dog-free environment. Both defendants aver that they did not retaliate against Perry.

It is well established that prisoners have no inherent constitutional right to placement in any particular prison, to any security classification, or to any particular housing assignment. *See Olim v. Wakinekona*, 461 US. 238, 245 (1983); *DeBlasio v. Johnson*, 128 F.Supp.2d 315, 328-29 (E.D. Va. 2000) ("Changes . . . in a prisoner['s] location, variation of daily routine, changes in conditions of confinement (including administrative segregation), and the denial of privileges – matters which every prisoner can anticipate are contemplated by his original sentence to prison – are necessarily functions of prison management that must be left to the broad discretion of prison administrators to enable them to manage prisons safely and effectively." (internal quotations omitted)). Based on the undisputed evidence, the court cannot find that Perry has demonstrated that the defendants took an action that adversely affected Perry's protected First Amendment activity. Accordingly, the court will grant summary judgment for defendants and deny it for Perry as to this claim.

### III. CONCLUSION

For the reasons stated herein, Perry's motion for partial summary judgment is denied and defendants' motion for summary judgment is granted.

An appropriate order will be entered.

Entered: March 27, 2019.

/s/ *Elizabeth K. Dillon*
Elizabeth K. Dillon
United States District Judge

---

still have been eligible for assignment to the Honor Dorm; however, his September 22, 2016 disciplinary conviction for possessing intoxicants made him ineligible for Honor Pod status, no matter which building he had been assigned to. (Reg. Grievance, Dkt. No. 45-1, 5; Collins Aff. ¶ 8, Dkt. No. 45-1.)